IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **QING QIN,** | : | CIVIL ACTION |
| **Plaintiff,** | : | |
| | : | |
| v. | : | No.: 20-cv-2423 |
| | : | |
| **VERTEX, INC.,** | : | |
| **Defendant.** | : | |

MEMORANDUM

**SITARSKI, M.J.**                                                                                           November 30, 2021

Presently pending before the Court is Plaintiff's Motion to Preclude Defendant's Expert, Irene C. Mendelsohn (Mot. to Preclude, ECF No. 27) and Defendant's response thereto (Resp., ECF No. 32).[1] For the reasons that follow, Plaintiff's motion shall be **DENIED**.

I.   FACTUAL AND PROCEDURAL HISTORY

Qing Qin worked as a software architect for Vertex, Inc. (Vertex), from October 16, 2000, until his termination on May 26, 2019. (Am. Compl., ECF No. 10, at ¶ 18). Qin, a Chinese national, alleges that Vertex passed him over for promotion and work opportunities, gave him negative performance reviews and ultimately terminated him due to his race and country of origin. (*Id.* at ¶¶ 16, 26, 38-40, 47, 49-56, 71-78). He brings claims for discrimination, hostile work environment and retaliation under Title VII of the Civil Rights Act of 1964, 42 U.S.C. 2000e et seq.; Section 1981 of the Civil Rights Act of 1866, 42 U.S.C. § 1981; and the Pennsylvania Human Relations Act, 43 P.S. § 951 et seq., as well as for declaratory and injunctive relief. (*Id.* at ¶¶ 84-188).

---

[1] The Honorable C. Darnell Jones, II referred the matter to me for disposition pursuant to 28 U.S.C. § 636(b)(1)(A). (Order, ECF No. 31).

Vertex has submitted an expert report from Irene C. Mendelsohn regarding Qin's "vocational outlook since his termination from Vertex." (Mendelsohn Rpt., ECF No. 27-1, at 1). In the report, she opines that Qin, who remains unemployed, would be "a highly desirable candidate" for a software architect or similar position but that he has made "insufficient efforts" at procuring new employment. (*Id.* at 3-4). She concludes that he could have located another position within a few months of his termination given the relevant labor market and job openings. (*Id.*). In support of this conclusion, she points to the United States Bureau of Labor Statistics' Occupational Outlook Handbook (Handbook), which, according to Mendelsohn, states that "the job outlook for software developers was rated as much faster than average for the 10-year timeframe cited (2019-2029)." (*Id.* at 3). She also references a March 2020 article by Contemporary Staffing, a job recruitment agency, indicating that "in 2019, the Greater Philadelphia[2] area alone had over 3,979 jobs posted for Software Architect related positions which was 24.3% more jobs than in 2018." (*Id.*). In addition, she identifies several "specific job openings for software architects or related capacities since Dr. Qin was terminated in mid-May 2019" and adds, "more anecdotally," that whenever she checked Indeed.com, a job listing website, in the weeks prior to completing her report in June 2021, "there have consistently been hundreds of jobs for software architect listed in the Philadelphia area, with tens of thousands in the United States." (*Id.* at 3).

At her deposition, Mendelsohn agreed that the Handbook does not list specific available jobs. (*Id.* at 80:1-16). Regarding the Contemporary Staffing article, she testified that she did not contribute to it, that she did not research where Contemporary Staffing obtained its data or conduct other follow up, and that she did not know about the jobs referenced therein. (*Id.* at

---

[2] Plaintiff resides in New Jersey, and Vertex is located in King of Prussia. (Am. Compl., ECF No. 10, at ¶¶ 11-12).

72:21-73:23). In her list of exhibits submitted with her report, she identified approximately eight positions open in the Philadelphia area[3] between September 2020 and April 2021, but she did not print any of the postings, and at least five[4] of the URLs associated with them were no longer operational by the time of her deposition in July 2021, such that further information about those positions is unavailable. (Mendelsohn Exhibit List, ECF No. 27-2; Mendelsohn Dep. Tr., ECF No. 27-3, at 47:1-7; Printouts of Nonoperational Links, ECF No. 27-4). Mendelsohn also testified that she did not print out any postings for the "hundreds of jobs" allegedly present in the Philadelphia area. (Mendelsohn Dep. Tr., ECF No. 27-3, at 46:20-24).

On September 20, 2021, Qin moved to preclude Mendelsohn from testifying in this matter on the basis that his methodology is unreliable. (Mot. to Preclude, ECF No. 27, at 16-17). Vertex filed its response on October 4, 2021. (Resp., ECF No. 32).

**II.  LEGAL STANDARD**

A district court has broad discretion in determining the admissibility of evidence. *See Walker v. Gordon*, 46 F. App'x 691, 694 (3d Cir. 2002). When faced with a proffer of expert testimony, the trial court must consider "whether the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact in issue." *Id.* (quoting *Daubert v. Merrell–Dow Pharm., Inc.*, 509 U.S. 579, 592 (1993)). "These gatekeeping requirements have been extended to apply to all expert testimony." *Id.* (citing

---

[3] Mendelsohn identified a ninth position open in Redmond, Washington. (Mendelsohn Exhibit List, ECF No. 27-2).

[4] The only URL that worked for the Court is the one associated with "city of philadelphia 3/21 software engineer." (Mendelsohn Exhibit List, ECF No. 27-2 (URL *available at* https://www.smartrecruiters.com/CityofPhiladelphia/743999739432687-associate-software-engineer (last visited Nov. 30, 2021))).

3

*Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141 (1999)).

The admissibility of expert opinion testimony is governed by Rule 702 of the Federal Rules of Evidence. It provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> > (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> > (b) the testimony is based on sufficient facts or data;
> > (c) the testimony is the product of reliable principles and methods; and
> > (d) the expert has reliably applied the principles and methods to the facts of the case.

FED. R. EVID. 702. The Third Circuit has explained that Rule 702 embodies a "trilogy of restrictions" on the admissibility of expert testimony: (1) qualification; (2) reliability; and (3) fit. *Schneider ex rel. Estate of Schneider v. Fried*, 320 F.3d 396, 404 (3d Cir. 2003). The party offering the expert must prove each of these requirements by a preponderance of the evidence. *In re TMI Litig.*, 193 F.3d 613, 663 (3d Cir. 1999), *amended on other grounds by* 199 F.3d 158 (3d Cir. 2000).

**III.   DISCUSSION**

In evaluating an expert's reasoning or methodology, a court should consider:

> (1) whether a method consists of a testable hypothesis; (2) whether the method has been subject to peer review; (3) the known or potential rate of error; (4) the existence and maintenance of standards controlling the technique's operation; (5) whether the method is generally accepted; (6) the relationship of the technique to methods which have been established to be reliable; (7) the qualifications of the expert witness testifying based on the methodology; and (8) the non-judicial uses to which the method has been put.

4

*De La Cruz v. V.I. Water & Power Auth.*, 597 F. App'x 83, 91 (3d Cir. 2014) (*Elcock v. Kmart Corp.*, 233 F.3d 734, 745-46 (3d Cir. 2000)).

"[T]his list is non-exclusive and . . . each factor need not be applied in every case." *Elcock*, 233 F.3d at 746 (citing *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137 (1999)). When, as here, a court must evaluate an expert's use of "a non-scientific method," the court should consider these factors "where they are reasonable measures of the reliability of expert testimony." *Id.* (quoting *Kumho Tire Co., Ltd.*, 526 U.S. at 152). The court's gatekeeping role requires that where an expert "base[s] testimony upon professional studies or personal experience, [he or she] employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field . . . ." *Id.* (quoting *Kumho Tire Co., Ltd.*, 526 U.S. at 152).

Nonetheless, an expert's opinion need only have "good," not necessarily "perfect," grounds. *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d at 744. Allowing an expert's opinion is not an endorsement of it. "Good grounds" may exist "for an expert's conclusions even if the judge thinks that there are better grounds for some alternative conclusion, and even if the judge thinks that a scientist's methodology has some flaws such that if they had been corrected, the scientist would have reached a different result." *Id.* A judge "will often still believe that hearing the expert's testimony and assessing its flaws was an important part of assessing what conclusion was correct and may certainly still believe that a jury attempting to reach an accurate result should consider the evidence." *Id.* at 745. In the end, "the reliability requirement must not be used as a tool by which the court excludes all questionably reliable evidence." *Id.* at 744. The "ultimate touchstone is helpfulness to the trier of fact, and with regard to reliability, helpfulness turns on whether the expert's 'technique or principle [is] sufficiently reliable so that it will aid

5

the jury in reaching accurate results.'" *Id.* (quoting *DeLuca v. Merrell Dow Pharms., Inc.*, 911 F.2d 941, 956 (3d Cir. 1990)).

Here, Qin bases his motion upon a single factor: the alleged fact that Mendelsohn's "questionable methods" "cannot be tested." (Mot. to Preclude, ECF No. 27, at 16). He complains that, by her own acknowledgment, she "merely provides anecdotal testimony as to the number of job openings for software architects . . . ." (*Id.* (quoting Mendelsohn Rpt., ECF No. 27-1, at 3)). He summarizes her report as concluding that because an internet search conducted at a given point in time purportedly yielded "hundreds of jobs," these positions have existed since his termination and he was qualified for and should have pursued them. (*Id.*). He maintains that "[t]his testimony, due to its completely untestable methodology and unpredictable internet search outcome, it too speculative to be admitted under *Daubert*, *Kumho* or *Elcock*." (*Id.* at 17). Qin points out that internet job searches might produce "extremely different results" depending on timing and that Mendelsohn admitted at her deposition that she could not know what all jobs have been available to him since May 2019. (*Id.*). He also insists that "there is no way of knowing" whether he should have applied for any of the "hundreds of jobs" because Mendelsohn did not print out any postings for them. (*Id.*). He calls it "pure speculation" that "hundreds of jobs" were open to him since his termination and concludes that the Court should preclude Mendelsohn's testimony because her "method of showing Plaintiff did not exercise reasonable diligence to obtain employment lacks any sort of methodology that can be tested . . . ." (*Id.*).

While Qin's motion centers on Mendelsohn's internet search and resulting conclusion that "hundreds of jobs" have been available to him, in Vertex's response it focuses on her use of the Handbook to determine the state of the market for software architects and similar workers since Qin's termination. It asserts that this "method can be duplicated and tested" by simply

6

reviewing the data contained in the Handbook. (Resp., ECF No. 32, at 4-5). It observes that district courts within this circuit have repeatedly held that consulting the Handbook and similar titles "is a reliable method to provide vocational expert testimony." (*Id.* (citing cases)). Vertex contends that Mendelsohn merely "supplemented the already available data" from the Handbook with her own research, which further supported the conclusion that Qin failed to conduct a reasonably diligent job search. (*Id.*). It argues that "[t]here is no basis for questioning the reliability" of this information and that, in fact, Qin's expert relied upon Department of Labor information in his report. (*Id.* at 5-6). It cites three cases in which courts have rejected attempts to preclude an expert's testimony regarding a plaintiff's job search in the relevant labor market. (*Id.* at 6-7). Finally, Vertex argues that Qin misconstrues Mendelsohn's proffered testimony because she does not intend to testify that there were "hundreds of jobs" available to him. (*Id.* at 7). Rather, she will testify only that "he should be employable because at the time he lost his job there were many openings in his field" and that his line of work "is considered to be growing rapidly, including since 2019." (*Id.* at 8).

The Court disagrees that Mendelsohn's internet searches for available positions for Qin were unreliable methods to determine his job opportunities because they cannot be recreated. As Mendelsohn explained at her deposition: "I think anybody can look on Indeed.com, put a software architect, put a Philadelphia, Pennsylvania area 25-mile limit and just take a look. It's easily accessible information." (Mendelsohn Dep. Tr., ECF No. 27-3, at 51:22-52:2). Plaintiff's counsel can cross-examine her as to these search parameters, just as he did at her deposition. (*See, e.g., id.* at 53:4-20 (questioning Mendelsohn as to why she searched for "all types of software architects" when "Qin's focus is tax software" and further inquiring whether Qin would be appropriate for a "language software architect" position)). He may also cross-examine her again regarding the results returned by her searches and, in particular, her failure to record them

in a usable format.  (*See id.* at 38:24-44:24, 45:21-53:3, 54:2-20, 56:7-56:16, 57:6-58:22, 59:14-18).  Qin correctly points out that a new search will likely not return the same results as Mendelsohn's prior searches in light of the ever-changing nature of the postings, but this fact merely provides additional grounds for cross-examination.  (Mot. to Preclude, ECF No. 27, at 16 (arguing that a search performed at a given point in time does not prove that "said jobs were available to Mr. Qin since his May 2019 termination")).  At trial, Qin's counsel, if he so chooses, may attempt to impeach Mendelsohn with the different search results, and the jury can decide whether Mendelsohn's defense of her search results withstands scrutiny.

Nor does the fact that the Handbook does not list specific job openings render it unreliable.  Mendelsohn may not rely on the Handbook to assert the existence of any particular available job, but she may provide testimony based on the contents of the Handbook, such as an opinion regarding "the job outlook for software developers" in the relevant time period.  (*See* Mendelsohn Rpt., ECF No. 27-1, at 3).  As Vertex suggests, others, such as Qin's expert, may easily test this methodology by reviewing the Handbook as well.  (Resp., ECF No. 32, at 4-5).  Further, courts have held that use of this "presumably . . . nationally recognized and accepted resource book in fields involving vocational matters" does not constitute unreliable methodology.  *Choiniere v. Presbyterian Healthcare Servs., Inc.*, No. 00-328, 2001 U.S. Dist. LEXIS 26270, at *8 (D.N.M. Jan. 16, 2001); *see also Oldham v. Albertson's LLC*, No. 3:13-CV-3799, 2015 U.S. Dist. LEXIS 181599, at *6-7, 10 (N.D. Tex. May 21, 2015) (rejecting the argument that consideration of Department of Labor statistics was unreliable); *McAndrew v. Del. & Hudson Ry. Co.*, No. 3:11-CV-01727, 2013 U.S. Dist. LEXIS 192743, at *4-5 (M.D. Pa. Mar. 4, 2013) (refusing to preclude the testimony of an expert who relied upon the Handbook).

Mendelsohn may also give opinions derived from the Contemporary Staffing article.  At her deposition, Plaintiff's counsel cross-examined Mendelsohn regarding the nature of

Contemporary Staffing, the authorship of the article, the data and jobs referenced in it, and her apparent lack of follow up regarding this information. (Mendelsohn Dep. Tr., ECF No. 27-3, at 72:21-73:23). He may do so again at trial, but the alleged questions surrounding the article do not establish its unreliability. It is not uncommon for experts to consider and rely upon articles in their industry or field as a basis for their opinions. *See Mortimer v. A.O. Smith Corp.*, No. 2:13-04169-ER, 2015 WL 12533103, at *6, 11 (E.D. Pa. Oct. 23, 2015) (rejecting the argument that the expert "ha[d] provided an opinion that is unreliable [ ]because it cites only two academic articles, neither of which supports his opinion"); *Inventio AG v. Thyssenkrupp Elevator Corp.*, No. 08-00874-RGA, 2014 WL 5786668, at *4 (D. Del. Nov. 6, 2014) (rejecting the argument that an expert's testimony was "*ipse dixit*" where he cited industry articles to support his opinion). "To the extent that [Qin] has an expert who bases his opinion on reliable studies supporting a different opinion, the matter is one that 'should be tested by the adversary process – competing expert testimony and active cross-examination – rather than excluded from jurors' scrutiny." *Mortimer*, 2015 WL 12533103, at *11.

IV.     CONCLUSION

For the foregoing reasons, the Court denies Qin's motion to preclude. At trial, Mendelsohn may testify consistent with the opinions set forth in her report.

BY THE COURT:

 /s/ Lynne A. Sitarski  
LYNNE A. SITARSKI  
United States Magistrate Judge